83h    53
38 Mis²370

FRANCIS D. CARLEY, Appellant, v. J. KENNEDY TOD and Others, Respondents.

*Private banker — application of chapter 409 of 1882 — obligation of a party to a contract to show that it is fair.*

The provisions of the Banking Act (§§ 68 and 69, chap. 409, Laws of 1882) in regard to usury, apply to private bankers, and not alone to that class of bankers whose business is similar to that of a National or State bank.

The burden is not imposed upon a party to a contract to establish that it was a fair and equitable contract, and that no undue advantage was taken of the other party thereto in exacting it from him, even where the other party to the contract was at the time that it was made in a necessitous condition.

APPEAL by the plaintiff, Francis D. Carley, from a judgment of the Supreme Court in favor of the defendants, entered in the office of the clerk of the county of New York on the 11th day of Janu-

ary, 1894, upon the decision of the court, rendered after a trial at the New York Special Term, dismissing the plaintiff's complaint upon the merits.

*Geo. C. Holt*, for the appellant.

*Stephen H. Olin*, for the respondents.

VAN BRUNT, P. J.:

Prior to December, 1888, the plaintiff, who had been residing in Louisville, Kentucky, was the president of two Kentucky corporations — The Kentucky Union Land Company and the Kentucky Union Railway Company. The land company was the owner of large tracts of land in southeastern Kentucky, and the railway company was organized to construct a line of railroad from Lexington, Kentucky, to a point in the vicinity of these lands, a distance of about 100 miles. The stock of the railway company was owned by the land company. The construction of the railroad had been commenced, and fourteen or fifteen miles of road had been substantially completed. In December, 1886, the plaintiff entered into certain negotiations for the furtherance of the enterprise in which he was interested with the defendants J. Kennedy Tod & Co., who were bankers doing business in the city of New York.

In the concise statement of the facts which it is considered neces sary to insert in this opinion it has not been deemed advisable to refer to all the negotiations which led up to the various agreements of these parties, nor particularly to refer to agreements which were subsequently abandoned, except so far as such agreements may tend to illustrate the position and rights of the parties as affecting the questions to which the adjudication in this action relates.

As the result of the negotiations between the plaintiff and the defendants Tod & Co., various arrangements were made in the month of January, 1889, some of which were abandoned, and finally, on the twenty-third of January, propositions in writing were submitted by the defendants Tod & Co. to the plaintiff and accepted by him, by which the defendants Tod & Co. agreed to purchase certain securities of the railway company, guaranteed by the land company, subject to examination and approval. The propositions of the defendants Tod & Co. were, on the 24th of January,

1889, accepted by the plaintiff, and contemporaneously with these agreements in respect to the purchase of the securities of the railway company as an independent transaction Tod & Co. agreed to purchase $500,000 of the capital stock of the land company, the entire proceeds of which were to belong to and be placed in the treasury of the land company. On the 9th of February, 1889, the defendants Tod & Co. accepted without reservation the propositions of sale of the railway company bonds upon the terms stated in the letter above referred to of the 23d of January, 1889. They thus became obligated to take from the plaintiff $1,000,000 of the railway company bonds and $200,000 of the five per cent preferred stock of the company at ninety-two and a half per cent of the par value of said bonds and accrued interest, less a commission of one per cent of the par value of the bonds. The stock and bonds were to be delivered, $500,000 of the bonds and $100,000 of the preferred stock, on the 1st of April, 1889, and $500,000 of the bonds and $100,000 of the preferred stock on the 1st of June, 1889. The defendants Tod & Co. also had an option to purchase from the plaintiff on the same terms as to price additional amounts of said bonds and preferred stock as follows: $500,000 in bonds and $100,000 in preferred stock on the 1st of July, 1889; the same amount on the 1st of September, 1889; the same amount on the 1st of November, 1889, and the same amount on the 1st of January, 1890. It was further agreed that the due payment of the principal and interest on said bonds and the dividends on said preferred stock should be guaranteed by the land company.

On the 23d of February, 1889, a further agreement was entered into between the defendants J. Kennedy Tod & Co. and the plaintiff, by which the defendants agreed, in consideration of two promissory notes, each for $40,000, to take from the plaintiff $850,000 of the railway company bonds, at the rate of ninety-two and one-half per cent of the par value of the bonds and accrued interest, in monthly installments, from the 1st of July, 1889, to November 29, 1890, it being expressly declared, however, that if the defendants Tod & Co. exercised the option which they held of purchasing from the plaintiff $500,000 of the railway company bonds and $100,000 of preferred stock on the 1st of July, 1889, the exercise of such option should be held as part fulfillment of this agreement. And

there was the same declaration in reference to the option maturing on the 2d of September, 1889. In February, also, the defendants Tod & Co. purchased of the plaintiff 1,000 shares of the stock of the land company at thirty-three.

On the 23d of March, 1889, an agreement was entered into between the railway company and the defendants Tod & Co. to the same effect as the agreement of February 23, 1889, between Tod & Co. and the plaintiff.

The defendants Tod & Co. exercised the first two options. The two promissory notes of $40,000 each were paid by the plaintiff in October, 1889. The two remaining options, each to take $500,000 of the railway company bonds and the accompanying guaranteed preference stock, were extended, the first, which was due on November 1, 1889, to not later than May, 1890, and the second, which was due January, 1890, to not later than August 1, 1890.

On the fourth of November the plaintiff wrote to the defendants Tod & Co. a letter, in which he says : " Assuming that our financiering, as you understand it, in regard to the railway completion will take care of that branch of the business, I think we ought to turn our attention to the interests of the land company. If we can arrange with those holding the $800,000 of K. U. land bonds to surrender them and take instead a like portion of a new first mortgage K. U. land bond, say $2,000,000, could you not form a syndicate which would take a few bonds of this new issue, say 250,000, with an option for a like amount every few months ?     *     *     *

" With the completion of the road assured, as it certainly now is, so far as necessary for the development of most of our properties is concerned, and with the study given to the lumber business by Mr. Baring, it occurred to me you would feel sufficiently assured of the income of the land company from lumber, cannel coal and sale of lands to speak of this new bond in such confidence that a syndicate would take hold of it. We need money for the land company at many points."

On the 17th of January, 1890, the plaintiff wrote to Tod & Co. as follows : " The temporary delay in the operation of the mill is working no injury, because we will be able to get fully ready for the opening of the spring trade, which commences in March." And then, after speaking of the great advantages which they would

derive from quarter-sawed oak and such kinds of wood, he says: " Meanwhile, the road is pushed to the utmost capacity of our cars, with the business forced upon us by the public, the construction business and the movement of. logs. As I wrote you before, there will not be a week in its history when it will not earn its fixed charges on the number of miles in operation. In fact, the spring months will show such large earnings that I fear we will hesitate to make them public on account of the interest which will be held by the counties of Fayette and Clark and city of Lexington."

On February 13, 1890, he writes to the defendants, and after speaking of the fact that it was not proposed at present to make public the earnings of ʼthe road and the condition of certain other enterprises connected therewith, he says: " The freight on these logs and the freight on our sawed lumber, both logs and lumber being at this moment where you can put your eyes on them, will give the road so much freight that we would not need but a small portion of what the public will do to earn the fixed charges. Your Mr. Tod will be pleased with the situation when he comes here. I do not intend to call him out here, however, until the dry kilns and planing mill are in operation."

On the 14th of February, 1890, the plaintiff writes that " these bonds should be brought out sometime along say about the first day of April or the fifteenth day of March, with the simple statement that this road, although new, has already passengers and traffic earnings which will provide for its fixed charges, and that you should be able to make this statement from the investigating trip which you will make in two or three weeks."

On the fifteenth he writes, amongst other things: " Glad to report that I have arranged for our payments for .this month, and feel everything is encouraging as far as I know, that we will earn by the twentieth of March $200,000 and be in funds again."

On the 19th of February, 1890, J. Kennedy Tod writes to the plaintiff acknowledging the receipt of the letters of the thirteenth and fourteenth of February, above mentioned, and telling him that he would come to Kentucky when the plaintiff thought the proper time had arrived, but he would like a week's notice, and that he would bring with him some friends. He states that he could not concur in the views of the plaintiff upon the subject of the issue of

bonds, and then gives his reason for such non-concurrence, and proposes a plan in reference to the issue of preferred stock by the land company, being evidently a counter proposition to that which was sent to Tod & Co. by the plaintiff on the 4th of November, 1889, above mentioned.

On the twentieth of February the plaintiff writes : " Fortunately we have only good news in regard to railroad construction, and it seems to be the conviction of the contractors and the railroad men that they will get through in time for the first $50,000." He then speaks of an interview he had had with Mr. Spencer, of the firm of Drexel, Morgan & Co., and says : " I think after I have been in Clay City a few days, and put everything in fine trim, that you will come there and be convinced that you can make your issue of bonds on the statement of the two companies that the net earnings of the railway company, or the net earnings of the land company, either of them, is sufficient to pay the fixed charges of the road. I shall be prepared to make this statement after the middle of March, or the first day of April, and I think you will be prepared to accept it as true. Of course I mean I will be using the present tense as to its. net earnings, and not the past."

On the fifth of March the plaintiff writes to Tod & Co. that he had been to their office to give them prompt notice that he was in negotiation with another banking house " in order to provide for those of our interest in regard to which you hold us in long uncertainty," manifestly endeavoring to egg on the defendants by the assertion that unless they were more speedy in their conclusion they would lose all the profits which might arise on the transaction.

On the seventeenth of March he finishes his letter as follows : " My most extravagant prophesies have been realized, and I now calculate that the profits of the K. U. Land Company will be, the next twelve months, not less than $800,000. Sales are being made and contracts closed which warrant these figures. We are getting benefits from the boom, but are allowing no boom prices or excitement, as our whole endeavor is to turn the excitement and speculative feeling of the; people into permanent developments and manufacturing and town developments along the road."

In the latter part of March, about the twentieth, Mr. Northcote, a member of the firm of J. Kennedy Tod & Co., a Mr. Menzies, a,

Scotchman, and Mr. Oyens, of Amsterdam, went to Louisville, and thence traveled over the property; and between Mr. Northcote, these gentlemen and the plaintiff, certain negotiations were had as to what should be done in the future. It is claimed by the plaintiff in this action that an agreement was entered into whereby the defendants exercised the option which did not become due until the 1st of May, 1890, for the taking of the bonds and stock; and that it was also agreed that the land company should obtain authority from the Legislature to issue $2,000,000 of preferred stock; that $1,600,000 of such preferred stock should in fact be issued, half of which should be taken by Carley and the other half by Tod & Co., and that Carley should with his $800,000 of preferred stock take up all of the outstanding $800,000 of land company bonds with the exception of about $100,000 of said bonds, which Tod & Co. had sold to their customers, and which it was claimed Northcote agreed that Tod & Co. should take care of; and that Tod & Co. should be paid $40,000 in cash for taking the $800,000 of preferred stock. This alleged agreement it is admitted was subject to the provision that Oyens and Menzies were to go over the property and should approve it. There were various other details relating to this alleged agreement which it is not necessary to mention. Northcote, Oyens and Menzies left Louisville and went over the property, and, it is claimed by the plaintiff, upon their return, were satisfied with the arrangement. But we have searched the record in vain to find, even from the testimony of Carley, that any agreement such as is claimed, was made. These negotiations undoubtedly took place, and propositions such as were testified to by Carley were made; but there is no evidence whatever that they were understood to be in the form of an agreement, or that Tod & Co. waived their right to refuse to exercise their option on the 1st of May, 1890. It is said that it was agreed that Tod & Co. should be paid $40,000 in cash for taking the $800,000 of preferred stock. But we fail to find any evidence of any such agreement. It is true Tod & Co. claimed a commission of five per cent, amounting to $40,000, but that there was any binding agreement to pay such commission nowhere appears in the record so far as we have been able to find. It is true that Carley in his testimony speaks of this agreement and that agreement in connection with this transaction; but when he gives that which

actually took place, it is evident that no agreement was entered into between the parties — that it was all tentative, and that there was no intention upon the part of Tod & Co. to waive their right to refuse to take the bonds on the 1st of May, 1890.

It is true that the plaintiff thereupon went to work in Kentucky and procured the passage of an act of the Legislature authorizing the land company to issue preferred stock; that he saw all the Kentucky holders of the land company bonds, endeavoring to arrange for their taking preferred stock in place of their bonds, and where they refused, himself purchasing their bonds for cash; and that he issued various notes and commercial paper payable at the office of Tod & Co. on the 1st of May, 1890, the date fixed for Tod & Co. to exercise the option in reference to the $500,000 of railway bonds, and when it was understood that the final arrangements in regard to the preferred stock of the land company were to be carried out. But all these things were based upon the assumption that it was for the interest of Tod & Co. to carry out this proposed agreement. In fact, the learned counsel for the plaintiff argues that Tod & Co. were in such a position that although they probably had the legal right to refuse to take any additional installment at any time if they saw fit, they never would do so and allow another banking house to purchase these bonds and put on the market a portion of this issue, and offer them for sale in competition with their own bonds. He says: "The provisions in the contracts made by Tod & Co. for options to take additional amounts of bonds in installments, while it probably conferred upon them the legal right to refuse to take any additional installment at any time if they saw fit, was, however, simply a provision for their protection in case of any unexpected developments substantially justifying a rescission of the contract; and it never could have been the intention of any of the parties, when Tod & Co. started to form a syndicate, take those bonds and build this railroad, that they should not, in substance, take the whole issue of bonds. Mr. Carley and everybody else who had put money into the enterprise had a right to rely upon and put confidence in the good faith of Tod & Co. in the administration of the financial affairs of the enterprise, and Tod & Co. had no more right when the enterprise got into financial difficulties to take an oppressive and unconscionable advantage of the situation to

compel exactions from the other gentlemen interested in the enterprise than one partner has to take advantage of his co-partner under such circumstances." In other words, that although Tod & Co. had an option to take these bonds, yet, because people had been acting upon the assumption that they had got their feet so deep in the mire that they could not get them out without sacrificing everything they had put into the enterprise, if they chose to make this sacrifice they should not be allowed to do so. We cannot understand that this was the position of Tod & Co. It is true that they were already possessed of a large amount of the securities and that they had this option. And this argument upon the part of the counsel for the plaintiff was probably the argument which brought the plaintiff to believe that he had an agreement with the defendants in regard to this land company business, and that they had agreed to exercise their option on the 1st of May, 1890. But as already stated, there is no evidence whatever of any agreement entered into by Tod & Co. which was binding upon them, nor any waiver of their rights to take the $500,000 in bonds and the stock on the 1st of May, 1890.

Without laying any stress upon the letters of the plaintiff which have been offered in evidence, and which contain expressions inconsistent with the idea that there was an agreement, let us come to the interview of the 1st of May, 1890, in which the defendants are alleged to have exercised their brutality as against the plaintiff. The plaintiff came to New York, to the office of Tod & Co., in reference to carrying out these preliminary agreements and securing the taking of the bonds in respect to which Tod & Co. held an option. Claims were made upon the part of Tod & Co. that their bookkeeper, who had been sent to Louisville to examine the accounts there, had reported that the obligations of the company largely exceeded those which had been reported by the plaintiff, and the plaintiff asserted that certain assets of the land company had not been sufficiently considered by the accountant; and then the bargain was made between the plaintiff and Tod & Co., which the plaintiff claims was exacted from him by his necessities, and letters were signed in the form of agreements embodying these contracts. It is true that the plaintiff claims that he protested against being compelled to accede to the terms which were offered him and that

the conduct of the defendants was brutal. But he nowhere claimed, as he now claims upon this appeal, that there was any binding agreement made prior to the 1st of May, 1890, which was contrary to this new arrangement. The plaintiff did claim that the defendants were driving the hardest kind of a bargain, to which his necessities compelled him to accede, because the notes which he had issued were becoming due, and it was impossible for him to pay them unless Tod & Co. exercised their option to take the bonds and thus provide the funds. But it nowhere appears that any claim was made at this time that there was any binding agreement as between these parties. In fact, we find from the evidence that in April the form of an agreement to be entered into to carry out the intention of the parties was being considered, and that the plaintiff made amendments thereto, and suggested in a lengthy memorandum in his own handwriting what should be the form of such agreement — a condition of affairs entirely inconsistent with the idea that there had been any definite agreement made in the March previous. Because, if such an agreement had been entered into, why should they be negotiating in regard to the terms of an agreement in April, and finally signing an agreement in May.

On the 13th of May, 1890, notwithstanding the brutality and amazing cruelty with which he had been treated by the defendants on the first, the plaintiff writes: " I send certificate to the amount of $100,000 face value of the common stock of the Kentucky Union Land Company, which I am arranging to sell in this market * * * as explained below. * * * Kindly attend to this at once, as the market is ripe here for the stock, fifty-five having been bid here to-day ; " five per cent higher than the stock was valued at in the arrangements between the defendants Tod & Co. and the plaintiff.

On the sixteenth of May one of the defendants writes to the plaintiff: " We note from your letters with great pleasure that the land company's common stock is quoted at 55 per cent. This, as you advised us formerly, is no doubt due to the present improved financial standing of the company, brought about by the sale of the preferred stock. We have 470 shares of common stock for sale at not under 50 per cent, and we fear that were we to proceed with its sale our interests might conflict in the market. We, therefore, suggest that you proceed with a sale on a three-thirds account ; that

is, in all sales made up to 1,210 shares you give us a one-third interest. Kindly advise us if this meets your views, and call upon us for our proportion of the stock as.it may be required."

On the twenty-second of May the plaintiff writes : " I have your note of the 16th of May, and cannot work the stock matter exactly as you suggest. I explained to Mr. Northcote what I am trying to do, and that is to place the stock that I bought from you around in the State of Kentucky, and get larger holding here, and more interest in the property. I am not selling any of my own stock, except as I bought it from you, and I have already arranged with the syndicate of Kentuckians to work this matter. I do not wish to approach these men about other stock until they are nearly through with the first lot. If you will give me a refusal of the 470 shares I will, as soon as I can do it, turn it over to them at cost, say at 50 cents, and let the syndicate make the difference if they can. This is what I have done with the $100,000 bought from you. Of course the syndicate must make five or ten points for us to work it. They are the most influential men I could find. If you will refer this to Mr. Northcote he will explain more fully, as I showed it up to him."

On the 30th, of May, 1890, the plaintiff, who had been so brutally treated by the defendants, writes to them : " Possibly it might interest you to know the feeling of the people here about our enterprise as reflected in the inquiries for the common stock. There are all sorts of bids made for the stock between 55 and 65, according to the eagerness of the buyer, but there is absolutely no stock offered. If my associates care to do so they could apparently sell their holdings very rapidly. There is a universal conviction throughout the State that this enterprise is destined to furnish the most substantial securities ever in the State."

The plaintiff having demanded a statement of his account on the 23d of May, 1890, Tod & Co. inclosed a statement of the account, showing, *first*, a note of the securities which they held against his account ; and, *secondly*, a statement of the account to date, showing a nominal balance. in his favor of $13,913.38. Attention is also called to the fact that they held a demand note of the plaintiff for $90,000 advanced on the eleventh of April.

On the 28th of May, 1890, the plaintiff wrote to the defendants as follows : "After surrendering my note for $90,000 and interest

and taking a new note for $50,000, dated May 1st, as arranged for the purchase of $100,000 common stock, and assuming that the Mechanics' Trust Company will remit $19,800 for the 198 shares K. U. preferred stock with interest, I will then be in your debt for immediate payment something over $6,000. Be kind enough to make up the account on this basis." On the same day he wrote : " Please send to the Mechanic Trust Company of Louisville the 198 shares of Kentucky Union Land Company preferred stock, writing them that I have asked you to send it to them, and to return to you, as it is sold, par and 6 per cent interest from May 1st. The president of this company is one of our little syndicate and the plan will be to work this off at earliest convenience."

On the fourth of June the defendants replied that they had sent the 198 shares to the Mechanic Trust Company for sale at par and seven per cent interest, instead of six per cent interest, as mentioned by him. They also say : " We have made up your account upon the lines indicated by you as far as possible, but we cannot, of course, anticipate the sale of the Land Company stock. We inclose a statement herewith showing a balance in our favor of $26,896.62.

" We also enclose herewith a note for $50,000 at six per cent interest, due 1st November next. Please sign it and return it to us at your earliest convenience. This note is secured by 1,000 shares of Kentucky Union Land Co. stock, and by any other securities which we may hold for you. The balance of our advance, as arranged by you, would be secured upon the Land Co. Preferred stock without any margin. We have, therefore, decided to hold the Railway Co. Guaranteed Preference stock. After the explanations and assurances given to us when you were here, we must decline to believe that you are encountering difficulties in financing."

On the twentieth of June Tod & Co. wrote to the plaintiff, asking for a return without delay of the note for $50,000. On the twenty-first of June the plaintiff writes Tod & Co.: " Having received only $10,000 from the $300,000 subscriptions, I have found it necessary to make two or three checks dated in July and payable at your office, for which, of course, you are not responsible. I am positive that I can have the funds there by that time."

On the 23d of June, 1890, the plaintiff writes to the defendants : " In reference to the proposed note for $50,000, I do not see how I

could pay it. My securities are so hypothecated that they are not available. When this transaction was pressed on me I stated that I thought I could dispose of it within six months, but the fact that the company is so largely in debt renders it impossible to sell here at this time. I make the proposition to you to exchange $50,000 of my preferred stock for this $100,000 of common stock.   *   *   *   I beg you to realize that this company is carrying a large floating debt, and while I am endorsing all its notes, it is not possible in so small a place as Louisville to make a market for this company's stock until we have our financial affairs in better shape."

On the twenty-sixth of June Tod & Co. replied to this letter. They say : " Your apprehension of difficulty in meeting the promised note when it falls due constitutes no valid reason for neglect hitherto to sign and deliver it. Surely our treatment of you in the past would justify on your part some belief that we could grant indulgence when it was deserved and sought in good faith. · We take exceptions to your remarks that the transaction was 'pressed' upon you. It was an ordinary business transaction, in which both you and we were free agents, and at the time it was entered upon you were confident the stock acquired by you could be sold readily at a good profit to the syndicate you proposed to create in Louisville. That your expectations have so far been disappointed we regret very much, but we are simply amazed when you inform us that this is due to the fact that the company (we presume you mean the Land Co.) 'is so largely in debt.' We do not suppose debt now exists of which you did not know during your recent negotiations with Mr. Oyens and ourselves, and we are, therefore, at a loss to understand you."

On the same day the plaintiff writes to Tod & Co. : " I am pained to write that our financial position is in a climax. When Mr. Church balanced our books as of the first of April he found we would have a floating debt, after the preferred stock was taken, of something over $400,000, as you stated in your office on the morning of the first of May. The fears that you then expressed have been verified. The vouchers for grading and masonry for April, May and June, the bills from the country people for ties and trestle timber, the collection of small bills for supplies and iron fixtures, the back percentage of contractors and other accounts for the railroad have brought this indebtedness to at least $700,000, and by July fif-

teenth it will be at least $750,000, and will probably cost at the lowest calculation still another hundred thousand to get the property in operation. * * * We cannot keep from protest longer than ten days, and this will precipitate us into chaos." He then states that he has talked the matter over for hours with the directors, and they could not see anything to relieve them except to make the best security the two companies could jointly make and try to realize among their friends as much as they could.. He then asks the defendants to come there for a meeting which they would have on Thursday, or if they could not come on that day to put it off until Friday or even Saturday.

On the twenty-eighth of June the plaintiff writes a personal letter to the defendant J. Kennedy Tod: " I addressed you a letter to-day as President which tells all there is to say about our unfortunate condition. I now wish to write to you a personal letter to say that I appreciate to the fullest degree your unfortunate position in this matter and that I will do all I can as I always have done to protect the credit of the road or of your relations to it, and to urge upon you the necessity of cordial co-operation with us to do what can be done, because I have the firm belief that if you help me to sustain the credit of the Company with our associates here and in this community that I can float some security here which will pull us through." And again: " You may be very positive that if I had believed the situation would come up as it is, I would not have put up my $600,000 on preferred stock in that position, nor would I have been a party to selling Mr. Oyens the common stock at 50, nor would I have hesitated a moment over declining to buy it myself at 50. * * * Now, if you do not wish to be a party to this new security I will cheerfully stand up for its responsibility, and will make such explanation in regard to the extra cost on the road as I best can in order to account for the language of a letter which I never should have signed. When I wrote that I believed the Land Company had realizable cash assets, I believed that by sacrificing myself or my securities I could make such securities as the Land Company had available to carry that floating debt or to balance it. I was mistaken, honestly mistaken, and you were more nearly right than I when you expressed the fear you did. * * * If you wish to throw the responsibility entirely on me you need not come, and

we will use the best security we can, and, of course, offer it to all stockholders alike, and I feel confident I can place some securities here if we can keep our credit as it now stands. I would much prefer for you to come here; but if you think best not to come, we will go on as best we can, and in that event I will prepare letter for Oyens and others explaining extra costs of R. R., etc."

On the thirtieth of June J. Kennedy Tod replies to this personal letter of the plaintiff: " I received your personal letter of the 28th current this morning, and I telegraphed you that I would meet you in Louisville on Thursday as requested. The extraordinary situation which your letter records baffles me when I attempt to deal with it by letter, but there are some things you say which I desire to answer by record.

" My brother did not, as you say, write that he ' declined to believe that you were in need of collateral.' What my firm did say was that ' After the explanations and assurances given to us when you were here, we must decline to believe that you are encountering difficulties in financing.'

" Had we known then, as we know to-day, for the first time, that large sums of indebtedness were concealed from our expert accountant, we would have understood your difficulty. * * * I protest against and resent your remark that if I do not give you more money ' we will both fall into positive disgrace in the eyes of the world.' Knowing the facts as you do, it is simply silly. Having in good faith invested my own and my friends' money in your enterprise, it is no more than my plain duty to come at once to Louisville and see what, if anything, can be done in a business-like way to protect them and myself, but I do not come to share any responsibilities which are primarily and exclusively yours, and I resent your seeming attempt to involve me in them."

On July third the plaintiff wrote in answer to this letter: " I regret very much to have used the word ' disgrace ' in regard to you and myself in my personal letter of the 28th. I did not give the meaning to the word which you seem to take. I should have used the word ' humiliating,' as you will readily see when you remember that I apply the same word to myself. In any event I regret to use the word, and assure you I have no meaning in it but that of humiliation from what I feared would be a calamity to both."

In August the plaintiff made additional application for money, trying to borrow $200,000 for himself, which was refused, and also applying to borrow money for the land company. Finally, on or about the 5th of September, 1890, it was agreed, after considerable negotiations, that Tod & Co. should advance the money, the plaintiff pledging certain securities and agreeing that all the money borrowed should be advanced by him to the land company. It was also agreed that the plaintiff should have an extension of time on his personal account, the amount of such personal account being calculated at $70,533.47, being made up of the $50,000 claimed to be due from the plaintiff for the common stock of the land company, which he had taken on the first of May at fifty, and the amount of $19,500, being the balance of the $200,000 of land company preferred stock which the plaintiff had been unable to sell, and which the defendants charged to him as upon a sale of stock with accrued interest. It was also agreed that the plaintiff should have his securities back, provided he paid within one year any notes outstanding of the land company, being part of said $200,000, and his note for $70,533.47, which he had given, dated September 9, 1890, to represent that amount and the additional sum of $50,000. The transaction was agreed upon on that basis, and subsequently an agreement embracing the same was signed sometime in November, 1890.

In 1892 this action was brought to set aside this transaction of September, 1890, upon the ground that the transfer of the securities by the plaintiff to Tod & Co. was without consideration, and was extorted by said Tod & Co. from the plaintiff by compulsion and duress, and by the pressure of the circumstances under which they were executed, and were usurious and invalid and void.

The defendants answered, denying the extortion and usury, and counterclaiming the amount of the notes held by them against the plaintiff.

Upon the trial the court held that the contract referred to was not without consideration and was not extorted; neither were the notes extorted from the plaintiff; and that although said agreement of September 8, 1890, and the said notes dated September 9, 1890, were affected by usury, they were not void on account of such usury or any other ground alleged in the complaint, but that said notes

were enforcible only to an amount in the aggregate of $69,500, and from this judgment the plaintiff appeals.

It is urged upon the part of the plaintiff that the transaction should be set aside by a court of equity as inequitable and oppressive, and as extorted by Tod & Co. from Carley under the pressure of his financial difficulties ; and it is claimed that the contract in question will be set aside as so oppressive and rapacious that it cannot be tolerated by a court of equity. .

It may be a question, upon a consideration of the whole of this evidence, as to who has been the greatest victim under the arrangement. There is no doubt that the plaintiff is of the opinion that Tod & Co. drove a hard bargain with him because of his pecuniary necessities. But it may be equally well claimed upon the part of the defendants that the plaintiff had made misrepresentations to them in regard to the success of the enterprise, and had concealed the true condition of its indebtedness in order that he might induce them to embark their moneys therein. The correspondence shows that glittering promises were held out by the plaintiff to these defendants to induce them to go on with the enterprise, and then its sudden collapse occurred because its indebtedness was so much greater than that which the plaintiff had represented. The argument of the plaintiff in support of his contention seems to be based upon the claim that because the defendants had large pecuniary interests in this enterprise, therefore they were bound to go on advancing money upon terms to be dictated by the plaintiff in order that they might not both be involved in the common ruin. In all these transactions the plaintiff was a free agent, and the necessitous condition in which he found himself seems to have been largely due to the fact of his shutting his eyes to circumstances in respect to which he had full knowledge, and of which the defendants were not made aware. Necessitous situations upon the part of a borrower always enable a lender to make a hard bargain, and the defendants, in their negotiations in May and September, 1890, seemed to have availed themselves of their situation. But there was nothing in their conduct which would enable the court to say that they had been guilty of fraud or of such conduct that they should be required to lose the money which they had advanced to this plaintiff and his enterprises in good faith.

It is claimed that the burden of proof was upon the defendants to establish that this contract was fair and equitable, and that no undue advantage was taken of the plaintiff in exacting it from him. And this proposition is sought to be upheld upon the ground that the relations between these parties were those of trust and confidence; that they were partners in this enterprise; that Tod & Co. were trustees and that the plaintiff was a *cestui que trust*, and that, therefore, they occupied fiduciary and confidential relations to each other. But even if this claim should be admitted there is no doubt that Carley deceived the defendants in regard to the situation of this property, and the results of that deceit were the placing of the enterprise in the necessitous straits which brought about these demands for additional loans. If the defendants occupied a trust relation to the plaintiff, certainly the plaintiff occupied a trust relation to the defendants, and he was bound as well as they to the utmost good faith in respect to the transactions which were undertaken between them. Now, he admits in his own letter that he had misrepresented the situation of this property, and that their accountant was right in regard to its financial condition, which he denied in May at the interview when he was desirous of getting the defendants to continue their advances in order that he might meet the obligations of his company. But there was no such relation. The parties were dealing at arms' length. The defendants were making the best bargain they could in their dealings with the plaintiff, and the plaintiff was making the best bargain he could with them, even inducing them, by his concealment of the condition of the company, to make the advances which they did, believing, as is argued by his counsel, that they were so deep in this enterprise that they could not withdraw. But the fact that they were in so deep and could not get out without loss was certainly no ground, as is claimed by counsel, which justified the plaintiff in claiming that they must necessarily go on and that they were estopped from not putting additional money into the enterprise.

It is to be observed in regard to the transaction of the 1st of May, 1890, that continuously thereafter in all his intercourse with the defendants, there is no word of complaint in regard to that arrangement or agreement. The first time that the plaintiff made any complaint was on the 23d of June, 1890, when he wrote to the

defendants that the transaction was pressed on him, Tod & Co. taking exceptions to the remark and calling attention to the fact that it was an ordinary business transaction in which they both were free agents, and at the time it was entered upon by the plaintiff he was confident that the stock acquired by him could be sold rapidly at a good profit to the syndicate he proposed to create in Louisville. And then the defendants called attention to the fact that they regretted that his expectations had been disappointed, but that they were amazed when he informed them that the land company was largely indebted, and that he must have known its condition when he induced them and their associates to make the additional advances of money, etc.

The plaintiff was at perfect liberty to decline these negotiations, but he was fearful lest Tod & Co. should not exercise their option and disaster result; and he used all his efforts to induce them to go further into the enterprise, and, if they desired additional profit, it is not uncommon practice amongst money lenders. If negotiations of this kind between grown-up men are to be set aside upon the ground that a man sells too cheap because he wants to realize the money, and the other man will not give him more for his property because he knows that he is in necessitous circumstances, commercial transactions might as well cease, because it would be impossible to tell when contracts were made whether they would not be set aside upon the ground that one party had taken advantage of the other.

It is further urged that the notes given by the plaintiff to Tod & Co., dated September ninth, aggregating $70,533.47, were without consideration. But this claim is dependent upon the proposition that Tod & Co. were already bound to do everything which they did do on the 1st of May, 1890, and that agreements had been made between the plaintiff and the defendants definite in their terms, by which they were bound to exercise their option on the 1st of May, 1890, and to do various other things not necessary to specify. As already shown in the statement preceding this discussion, there is no evidence of any agreement entered into at the time of Northcote's visit to Louisville. It was all tentative; propositions merely. It is true the plaintiff went on to prepare himself to carry out such an agreement if entered into, but there is no evidence that any binding agreement was made in March, or at

any time prior to the 1st of May, 1890, between these parties in respect to the matters which formed the subject of the agreement of that date. It is .true the plaintiff speaks of agreements, but when he goes on to state what took place the evidence of agreement vanishes. It was simply his construction. It is inconceivable that in April they should be negotiating in regard to the terms of an agreement to be executed in May, if such an agreement had already been entered into verbally and its terms were definitely understood. We find, as already stated, negotiations being had between these parties in April in reference to the form of agreement and suggestions made by the plaintiff in his own handwriting as to what the agreement should contain. He seems to have come to New York in April for that purpose and to have stayed some time. He then comes back in May, 1890, it being absolutely necessary for the safety of the enterprise that the defendants should exercise their option on the first, and then the bargain is made which is now impeached — a bargain which resulted in the owing of the amount which formed the basis of the notes. As an additional evidence of the fact that there was no previous agreement, and that all that was done on the first of May was not without consideration, the fact appears that when Tod & Co. demanded their note for $50,000, which was agreed to be given, the plaintiff did not say he did not owe it, but simply that he could not pay it, and, therefore, he did not want to give the note.

It is further urged that the contracts of September 8, 1890, were void because the circumstances under which they were entered into amounted to duress. What has already been stated upon the subject of duress in respect to the agreement of the 1st of May, 1890, is equally applicable to that of September 8, 1890. The plaintiff wanted $200,000. It was absolutely necessary for this enterprise that he should obtain that money, and he agreed to pay for it, and to give pledges for its repayment he put up his securities as collateral to this advance and to pay the seventy odd thousand dollars and a bonus of $50,000. As the court says, there is no question about the fact that this transaction was usurious, and that so far as the interest and usury were concerned no recovery could be had ; but that the defendants could recover the $69,500 which the plaintiff owed to them growing out of the transaction of the 1st of May, 1890.

The learned counsel for respondents claims that there was no usury in respect to this transaction, but it seems to us that it stands out upon the transaction as prominently as any agreement in it, and no proof of its existence is necessary but the agreement itself; and that the defendants were so advised clearly appears by the evidence. The court, however, held that these transactions were not void for usury because of the provision of the Banking Act (§§ 68 and 69, chap. 409, Laws of 1882) applicable to this case, the defendants being private bankers, and the law as it existed at the time of these transactions exempting private bankers from forfeiture of principal on account of usury. That the act in question applied to private bankers seems to have been decided in the case of *Perkins* v. *Smith* (116 N. Y. 444), and the learned counsel for the appellant admits that if this decision of the Second Division of the Court of Appeals is conclusive upon this court, it is unnecessary to discuss it here; but he submits, if this court can consider the question, that the act never could have been intended to apply to a mere private banker, but was intended to apply to that class of bankers whose business is similar to that of National or State banks. In answer to this suggestion we may say that as we entirely approve of the decision of the Second Division of the Court of Appeals upon this point we shall deem it conclusive upon us. The language of the act seems to be too plain to admit of discussion.

The judgment should be affirmed, with costs.

PARKER and O'BRIEN, JJ., concurred.

Judgment affirmed, with costs.