In re SAMUEL WILDE'S SONS.

(District Court, S. D. New York. December 5, 1904.)

1. INTEREST—USURY—STATE LAWS.

Under the laws of New York, the fact that a larger amount has been paid for the use of money than the legal rate of interest does not establish usury, in the absence of proof of a usurious contract pursuant to which the interest was paid, though the excess was paid as interest.

2. SAME—BANKRUPTCY—CLAIMS—ALLOWANCE—BURDEN OF PROOF.

Where a trustee in bankruptcy contested a claim on the ground of usury, the burden of proof thereof was on him.

3. SAME—EVIDENCE.

In a proceeding for the allowance of a claim against a bankrupt's estate, evidence reviewed, and held insufficient to establish a defense of usury.

¶ 2. See Usury, vol. 47, Cent. Dig. § 308.

4. SAME—BROKERS—SERVICES—COMPENSATION.

Where claimants were note brokers, and, as such, had been engaged for a long period in selling the notes of a bankrupt firm, and loaning money on such notes as collateral before they could be sold, the compensation paid by the firm for such services could not be treated as interest to sustain a defense of usury.

5. SAME—STATUTES—LOANS OF MONEY—ORAL CONTRACTS.

Laws N. Y. 1882, p. 290, c. 237, abolishing the usury law in respect to advances of money payable on demand to an amount not less than $5,000, made on negotiable instruments pledged as collateral security, makes such loans providing for a payment of interest in excess of the legal rate nonusurious, though the agreement is oral.

6. SAME—COLLATERALS.

Where note brokers had been engaged in selling notes of a bankrupt firm to a large amount, and on several occasions had made advancements to the firm on such notes before they could be sold, intending to secure reimbursement from such sale, the notes should be treated as collaterals to such advances, within Laws N. Y. 1882, p. 290, c. 237, abolishing the usury law with respect to advances of money payable on demand to an amount not less than $5,000, made on negotiable instruments pledged as collateral.

7. SAME—BANKS.

The national bank act [3 U. S. Comp. St. 1901, pp. 3454–3493] provides that usurious interest cannot be collected, but does not impose a forfeiture of the principal as a penalty for usury. Laws N. Y. 1870, p. 437, c. 163, subjected state bank associations to the same liability in respect to usury as national banks, and Laws 1880, p. 823, c. 567, declares that the former acts should apply to private or individual bankers. *Held*, that the effect of such legislation was to abolish the statutory forfeiture of the principal of usurious loans made by all persons engaged in the business of banking in New York.

8. SAME.

Where note brokers adopted as a branch of their business the making of loans to their customers on security of the notes held for sale, they thereby became engaged in the banking business, within Laws N. Y. 1870, p. 437, c. 163, as amended by Laws 1880, p. 823, c. 567, under which bankers are exempt from liability for forfeiture of the principal of usurious loans.

In Bankruptcy.

See 131 Fed. 142.

Morris J. Hirsch (Herbert H. Maass and Charles Grossman, of counsel), for claimants H. C. Bennett & Co.

Smith & Bowman (Henry H. Bowman and Harold H. Bowman, of counsel), for trustee.

HOLT, District Judge. This is a proceeding to review an order of the referee expunging the claim of H. C. Bennett & Co. against the bankrupt estate for $102,564.59 for money loaned. The trustee contested it on the ground of usury, and the referee sustained the contention. The claimants contend that usury cannot be pleaded in bankruptcy, but it appears to be settled by a decision of the Circuit Court of Appeals that a trustee in bankruptcy can interpose the defense of usury in opposition to a claim filed against the bankrupt estate. Matter of Kellogg, 10 Am. Bankr. Rep. 7, 121 Fed. 333, 57 C. C. A. 547. By the decisions in the courts of New York, the fact that a larger amount has been paid for the use of money

than the legal rate of interest, even if the excess is paid as interest, does not establish usury. There must be proof of a usurious contract pursuant to which the interest was paid. White v. Benjamin, 138 N. Y. 623, 33 N. E. 1037; Rosenstein v. Fox, 150 N. Y. 363, 44 N. E. 1027; Bosworth v. Kinghorn, 94 App. Div. 187, 87 N. Y. Supp. 983. The party pleading usury has the burden of proof. The trustee in this case, therefore, in order to maintain his objection, must establish by a preponderance of proof that there was a contract made to take usury. The facts bearing on this question are that prior to 1899 the firm of H. C. Bennett & Co. was composed of Daniel H. Bennett and Hiram C. Bennett; that in 1899 Daniel H. Bennett died, and a new firm was formed, composed of Hiram C. Bennett and Edward H. Bennett, who under the same name have continued the business to the present time. The original business of the firm was that of note brokers. Prior to 1899 transactions began between them and Samuel Wilde's Sons, the bankrupts. They at first acted simply as note brokers to sell the bankrupts' notes. After a while the practice arose, when the bankrupts needed money upon notes before Bennett & Co. could sell them, that Bennett & Co. would advance money to the bankrupts until the notes could be sold, and when sold Bennett & Co. reimbursed themselves from the proceeds. As soon as these advances became large, Bennett & Co. were obliged to borrow money from banks in order to be able to make them. The money borrowed from banks was not turned over in specie to the bankrupts, but the making of such loans to the bankrupts made it necessary, in frequent instances, to borrow the money. Bennett & Co. originally charged various amounts for obtaining this money, varying from 7 per cent. to 13½ per cent., according to the varying conditions of the money market. After a certain period it was agreed between the parties that there should be a uniform charge of 12 per cent.; that when notes were sold the whole amount should be collectible, but, when money was advanced on account, 6 per cent. should be paid at the time, and a further sum of 6 per cent. at the end of the year. This was the manner in which business was being carried on between the parties at the time that Daniel H. Bennett died and the new firm was formed. Obviously, if the old firm had made a usurious contract, that would not establish that the new firm had entered into a similar usurious contract. The trustee is therefore bound to show that after the new firm was organized a usurious contract was made. It is admitted that there never was any written contract on the subject, but it is claimed that at a conversation in March, 1901, between Mr. Harris, a gentleman who represented the bankrupts' firm, and Mr. Hiram C. Bennett, such an agreement was made. At the time of this conversation the balance on the loan account had reached a figure of over $100,000. Bennett & Co. had demanded a reduction in the amount of the loan, and the object of this interview was to discuss that subject. Bennett & Co. had not, before the interview, made any demand for an increase of the rate of interest, or said anything on the subject, but Mr. Bennett demanded at the interview that the amount of loans should

565 IN RE SAMUEL WILDE'S SONS.

be reduced to $75,000. After this subject had been discussed, and the proposed reduction assented to, Mr. Harris says:

"I then said to Mr. Bennett: 'And now, as to all the loans and notes in the future, the rate of interest shall be the same in the future as it has been heretofore; that is, 12 per cent. upon the notes at the time of sale and settlement, and 6 per cent. upon the loans at the time the loans are settled—each loan—and at the end of the year the additional 6 per cent., making 12 per cent. upon the loans and upon the notes.' He said that was satisfactory. That was as we had been doing, and it was to be continued."

This is substantially the sole proof of the alleged contract of usury. Mr. Harris states this conversation again on cross-examination several times, but substantially in the same way. Both Hiram Bennett and Edward Bennett testify that they were present at the conversation; that the subject of it was exclusively the reduction of the loan account; and both deny that anything was said at that time or any other time about the rate of interest. Mr. Harris admits that the Messrs. Bennett did not introduce the subject, and never then or at any other time demanded any increase of the rate. The 6 per cent. which was to be paid at the end of the year was not paid regularly or in exact amounts, and never appears to have been demanded by Bennett & Co. Whenever the bankrupts found it convenient they paid it—sometimes in full and sometimes in sums on account. Upon this evidence it does not seem to me that the trustee has proved by a preponderance of testimony that there was a specific contract made about interest. Harris says there was, and the two Bennetts say there was not. There appears to be no reason for anything being said at that interview on the subject. Bennett & Co. did not ask for any change in the rate of compensation, and no change was made. If such a conversation took place, the result was just the same as though nothing had been said. At the same time, if there were nothing else in the case, I should hesitate to interfere with the decision of the referee on a question so purely one of fact.

But it seems to me that the evidence establishes that the excess of money paid over the legal rate of interest, even if it was sometimes termed interest by the parties, was not interest, and was not understood to be interest. Bennett & Co. rendered services as note brokers to the bankrupts, for which they were entitled to compensation, and they gave the bankrupts the benefit of their credit at the bank, for which they were entitled to compensation. It is perfectly well settled that parties rendering such services are entitled to compensation for them. Claims of such services may be made a cloak for usury, but, if they were rendered in point of fact, the compensation for them is not usury. In this case Bennett & Co. raised for the bankrupts, by the sale of their notes or by advances, between March, 1901, and July, 1902, nearly $2,000,000. The loan account during all that period was substantially about $100,000, and Mr. Bennett testifies that, had it not been for the loans to the bankrupts, they would not have been obliged to borrow money from banks in their business. When they borrowed money from banks, the banks presumably took off the legal discount, and the trustee's proposition is that this money should have been turned

over to the bankrupts without any further deduction. If the bankrupts could have borrowed the money from the banks on their credit, they would probably have done so; but, if they needed, in order to obtain it, to have the benefit of the credit of Bennett & Co., there is no reason why they should not make a valid contract to pay for it.

Moreover, I do not see why the defense of usury to this claim is not barred by the act of 1882 (Laws 1882, p. 290, c. 237), which, in substance, abolishes the usury law in respect to advances of money payable on demand, to an amount not less than $5,000, made upon negotiable instruments pledged as collateral security. The counsel for the trustee asserts that under that act the contract must be in writing. But it has been held that the only necessity of a writing under that act is in order to enable the lender to collect more than 6 per cent. The statute makes such a loan nonusurious even if the agreement is oral. Hawley v. Kountze, 6 App. Div. 217, 39 N. Y. Supp. 897. The trustee's counsel asserts that the negotiable paper of the bankrupts in the hands of Bennett & Co. for sale was not collateral security. I cannot see why it was not. Bennett & Co. held at the time of the failure 32 notes, for $5,000 each, amounting to $160,000, made by the bankrupts, payable to the order of themselves, and indorsed by them. These notes had been sent to Bennett & Co. for sale. Bennett & Co. had advanced to the bankrupts about $102,000 in anticipation of the sale of these notes, and in reliance upon reimbursing themselves out of the proceeds of the sale. It is true that they were made by the bankrupts, but they were not given for the advances. Their amounts did not correspond with any advances, and no particular note was held as a particular security for any particular advance. Of course, so long as they remained in the hands of Bennett & Co. unnegotiated, they had no validity; but the power which their negotiability conferred upon Bennett & Co. to use them for the protection of their own advances made them, it seems to me, clearly collateral security. I therefore cannot see why, even if this was a usurious contract, the act of 1882 does not apply.

I also think that the provision of the usury law forfeiting the principal of a usurious loan does not apply to Bennett & Co., because in that part of their business in which this claim was incurred they were private bankers. The national bank act [3 U. S. Comp. St. 1901, pp. 3454–3493] provides that usurious interest cannot be collected, but it does not impose as a penalty for usury the forfeiture of the principal. In 1870 the Legislature of New York passed an act (Laws 1870, p. 437, c. 163) subjecting state banking associations to the same liability in respect to usury that the national banks were under. In 1880, by chapter 567 (page 823), this act was amended so that it should apply to private or individual bankers doing business in this state. This amendment, in substance, was incorporated in the banking act of 1882, being sections 68 and 69 (Laws 1882, pp. 607, 608, c. 409). Under this legislation the Court of Appeals held that the effect of the amendment of 1880 was to abolish the forfeiture of the principal of usurious loans made

by all persons engaged in the business of banking, including not only those doing business under the authority of the Superintendent of Banking, sometimes termed "individual bankers," but all other persons engaged in the banking business. Perkins v. Smith, 116 N. Y. 444, 23 N. E. 21. The making of loans on collateral security is part of the business of banking. In this case Bennett & Co. not only made advances to the bankrupts, but they had 25 or 30 similar accounts. Undoubtedly their original business was that of note brokers, but, in my opinion, when, instead of confining their business to selling notes of their customers, they adopted as a branch of their business the making of loans to their customers on the security of the notes held for sale, they became engaged in the banking business. In Linde v. Grant (Sup.) 13 N. Y. Supp. 533, the plaintiffs were warehousemen; but, as a part of their business, they made advances on the security of warehouse receipts, and the court held that in respect to such advances they were engaged in a banking business. The trustee's counsel argues that it is necessary, in order that a man should be a banker, that he should receive deposits subject to check. That was originally undoubtedly a common branch of a private banker's business, and the defendants in Perkins v. Smith did receive such deposits. But in Carley v. Tod, 83 Hun, 53, 31 N. Y. Supp. 635, the defendants did not receive deposits subject to check. Their business was that of ordinary private bankers in this city, very few of whom, as a part of their business, receive deposits subject to check. Their business consisted in making loans on collateral, dealing in bonds, stock, and negotiable securities, and financing general business enterprises. I was counsel in that case, and urged strenuously that the decision in Perkins v. Smith did not apply; that the rule there laid down, if applied to ordinary private bankers who receive no deposits, practically nullified the usury laws of the state, and enabled any man to make usurious loans provided he did it as a regular business; but the court disregarded the argument, and held that, under the authority of Perkins v. Smith, loans which the court held to be unquestionably usurious were entirely valid as to the principal sum loaned, because the defendants were private bankers.

The simple fact is that the provision of the usury laws of New York which imposes as a penalty for usury the forfeiture of the principal of the loan is so harsh that the courts of New York have in some cases given a strict construction to the law, in order to avoid injustice. It is, of course, the duty of this court to follow the rules laid down by the state courts in the interpretation of state statutes.

My conclusion is that the order of the referee expunging this claim should be reversed, and the claim allowed as filed.