### In re FISHEL, NESSLER & CO.

(District Court, S. D. New York. December 1, 1911.)

1. USURY (§§ 113, 11*)—USURIOUS CONTRACTS—BURDEN OF PROOF.
    The burden is on one alleging usury to prove it by clear and satisfactory evidence, and, it being largely a question of intent, the unlawful usance must have been given and retained in pursuance of an agreement, mutual and existing at the inception of the transaction.
    [Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 308–323; Dec. Dig. §§ 113, 11.*]

2. USURY (§ 53*)—USURIOUS CONTRACTS.
    Loans made on assigned unmatured accounts under an agreement requiring the borrower to pay 6 per cent. interest and also 5 per cent. on the amount of the accounts assigned as a commission for collection were usurious under the General Business Law of New York (Consol. Laws 1909, c. 20) § 373, which makes the taking of any greater sum for a loan than 6 per cent. usury, where, by an additional provision, the borrower was to do the collecting, and the lender agreed that it would have no communication with the borrower's customers whose accounts were assigned.
    [Ed. Note.—For other cases, see Usury, Cent. Dig. §§ 114–118; Dec. Dig. § 53.*]

In the matter of Fishel, Nessler & Co., bankrupts. On report of referee as special master. Findings reversed.

Before petition filed the bankrupts had borrowed, on assigned accounts, from three concerns; i. e., National Discount Company, Traders' Commercial Com-

pany, and Bloomingdale Bros. In several instances, either by inadvertence or design, the same account was assigned to more than one lender. Bankruptcy having supervened before many of the accounts were due or paid, the trustee in bankruptcy collected the amounts thereof. Thereupon the three lenders above named petitioned for orders requiring the trustee to pay over the proceeds of accounts averred to belong to them. Two questions arose upon the reference: (1) Whether the transactions between bankrupts and National Discount Company were tainted with usury; and (2) to whom did the accounts belong which had been assigned more than once.

Mr. Stroock and Chas. Levy, for trustee.

Mr. Kresel, for National Discount Co.

Mr. Wolf, for Traders' Commercial Co. and Bloomingdale Bros.

HOUGH, District Judge (after stating the facts as above). The principal question submitted must depend for solution on the law of New York as declared in its statutes and interpreted by its highest courts. It is often said that usury consists in exacting a higher rate of interest than that authorized by law. The expression is colloquial, and does not pretend to exactness, yet the idea that usury is allied to interest (eo nomine) has appeared in argument, and befogged the matter.

Section 373 of the general business law (Consol. Laws 1909, c. 20) declares that:

"All * * * contracts or securities * * * all deposits of goods or other things * * * whereupon or whereby there shall be reserved or taken, or secured or agreed to be reserved or taken any greater sum * * * or value, for the loan * * * of any money (than six per cent. per annum) shall be void."

Language could not be broader or more plain; and, under it, courts are bound to inquire whether by any device, however circuitous, or under any name, however fair in sound, a borrower is surrendering and a lender exacting more for the use of money than an equivalent of the legal rate of interest, whether paid in money or otherwise.

Considering the attitude of most states and countries on this subject, the New York act seems archaic, but that can make no difference in the duty of courts. Since, however, in order to reveal usury, it may be necessary by oral evidence to prove the falsity of paper contracts fair and legal on their face, experience has shown that the statute contains a temptation to rascally borrowers to avoid payment of just debts by offering usury as a defense. On this knowledge of human weakness are founded certain rules of decision—judge made, but long since established beyond cavil.

[1] Thus the burden is on him who alleges usury to prove it by clear and satisfactory evidence—the offense is largely one of intent—and the unlawful usance must be given and retained in pursuance of an agreement, mutual and existing at the inception of the transaction. Rosenstein v. Fox, 150 N. Y. 354, 44 N. E. 1027, and cases cited.

It also happens not infrequently that the lender does more than merely hire out his money, and for such additional service he is entitled to be paid, if the service be actual, and whatever objection there

may be to his rate of charge, it cannot be based upon the usury stat-
ute, unless the whole transaction is plainly but a cover for unlawful
lending.   Re Wilde's Sons (D. C.) 133 Fed. 562, and cases cited.

But if, when all the evidence and explanations have been considered,
it clearly appears that all the lender did or expected to do was to
loan, and all the borrower got or expected to get, was money, then
any word or phrase, any collateral or cotemporaneous agreement by
virtue of which more than the amount of the lawful rate flows into
the pockets of the lender, must and should be swept aside, and the
intended and agreed upon usury denounced.   See especially Heiden-
heimer v. Mayer, 42 N. Y. Super. Ct. 506, affirmed 74 N. Y. 607.

[2] The facts of this case are not difficult, indeed in one sense of
that word, they are not disputed; i. e., it is not denied that certain
papers were exchanged, and many words spoken, as a result of which
a course of business began some months before bankruptcy and con-
tinued down to that calamity.   The contest rages, not over facts in
the sense just illustrated, but over the inferences of intent to be
drawn from admitted actions.

The master's finding is that he cannot draw the inference of intent
necessary to establish the conclusion of usury because the trustee has
not sustained the burden of proof.   This really means that the admit-
ted facts do not warrant the inference and conclusion above stated;
and produces for the court a question rather of law than fact, a ques-
tion, indeed, of "secondary law" as to the sufficiency of evidence con-
clusive on the facts, using that word in its simple meaning of things
seen and heard, spoken, or written.

In July, 1910, the bankrupts were in straits, and wished to borrow
on open and unmatured accounts.   They sought information from the
discount company, and received a letter containing the following:

"We make advances upon outstanding accounts equal to 75% of the net
face value of the invoices, the other 25% being returned to you when pay-
ments are made to us.

"*Our commission charge is 5% on the gross amount of business assigned,
and we charge interest on all loans* made at the rate of 6% per annum upon
daily balances.   That is to say, we charge interest at the rate of 6% per
annum on all moneys loaned and we credit your account with interest at
the rate of 6% per annum upon all moneys received by us."

On August 8th they signed a printed form agreement, by which
they were to actually assign and transfer accounts to the discount
company, and receive a stipulated percentage of their face by way of
loan.   The agreement was to cover all future transactions, and all
accounts assigned were to be security for all loans.   A regular scheme
of future business was set forth in this document.   It contained es-
pecially the following sections vital to the present controversy:

"Sixth. The customer agrees to pay to the banker in cash or allow the
banker, if it so elects, to retain from any moneys advanced, collected, or
received upon the accounts of the customer a commission of 5 per centum
on the gross amount of accounts of the customer assigned to the banker, to
reimburse the banker for services rendered or to be rendered in the collection
of the accounts, such as sending out statements, attending to all correspond-

ence, adjusting returns, allowances, discounts and investigations with reference to same, and for assisting in extending credits, securing references and reports and generally in aiding and assisting the customer with his credit department. The customer also agrees to reimburse the banker for such outlays as exchange on checks and postage.

"Seventh. The banker shall further be entitled to charge interest at the rate of (6%) six per centum per annum on all moneys advanced by it to the said customer, and the customer shall be entitled to receive credit at the rate of (6%) six per centum per annum upon all moneys collected and received by the banker upon accounts transferred to the banker."

Cotemporaneously with the delivery of this agreement by bankrupts to discount company, the former wrote a letter, as follows:

*"In signing the inclosed formal agreement, it is agreed and understood that you are at no time to have any communication whatever with any of our customers, and that the accounts are only to be used as collateral for loans made. We are to collect all outstandings and agree to indorse and turn over the checks to you as received, and if at the expiration of each loan the full amount is not paid, we are to send our check to wipe out such loan."*

All this was before any loan was made, and in my opinion, if the discount company thereafter accepted any offerings of accounts from bankrupts, it did so under the terms of the letter if such letter in any way varied the agreement. On August 9th accounts were assigned and accepted and a loan made. The form of loan is significant. A clerk of bankrupts made a note (without consideration), bankrupts indorsed it, and in form sold the note to the discount company, which thereupon handed over to them the stipulated percentage of the face of assigned accounts accompanying the note.

Before considering the oral testimony, the effect of the quoted letter upon the agreement is to be considered. It absolutely nullified the entire consideration for the so-called "commission," except as follows:

"For assisting in extending credits, securing references and reports, and generally in aiding and assisting the customer (i. e. this bankrupt) with his credit department."

Even without other testimony, it is difficult to see how any of these services could be performed if the discount company forebore any communication with the debtors on the accounts assigned.

As stated by Lewis, the secretary of the discount company, the effect of the letter was an agreement on his part that, as long as the bankrupts kept their agreement (i. e., paid their clerk's notes when due), they might do their own collecting, the company would not communicate with their debtors, and he fairly admits that down to bankruptcy his company performed "none whatsoever" of the services mentioned in the quoted sixth paragraph of the agreement. The inference is irresistible that the company never expected nor intended to perform any of them, and agreed to refrain therefrom.

Contracts are to be interpreted on the assumption that they are made to be fulfilled and in expectation of fulfillment. Here the discount company is conclusively held to have agreed to refrain from doing any service "whatsoever" in consideration of 5 per cent. on the

face of the assigned accounts, and yet to have intended[1] to take the percentage, and procured the bankrupts' assent thereto. As matter of fact some of the loans were repaid before bankruptcy and the 5 per cent. charged without dissent or complaint.

After bankruptcy, and when the inability of its principal debtor to pay became apparent, the discount company became very active, and sought to exercise to the full its legal ownership of the accounts. Such activities were not services to the bankrupts, but merely measures of self-protection such as any holder of collateral would naturally and legally take.

To me it appears plain beyond any doubt whatever that the parties to this transaction agreed perfectly that, if Fishel would suffer a charge of 6 per cent. on money loaned and 5 per cent. on collateral hypothecated therefor, the discount company would forego its usual (or at all events stipulated) method of doing business, and do absolutely nothing but loan money, unless a breach of contract on Fishel's part required them to take further proceedings, but this last the company would have been obliged to do, agreement or no agreement.

Cotemporaneous construction, evidenced by the actions of the contracting parties before breach, shows the discount company in the exact position of a lender on collateral with legal title to the same, in effect a chattel mortgagee, charging by agreement before loan 6 per cent. on the loan and 5 per cent. on the face of the collateral, equivalent on a 90-day accommodation to over 25 per cent. per annum. A plainer case of actual and actually intended usury I cannot imagine.

The petition of the National Discount Company is rejected, and it is charged with one-third of the expense of the reference. This disposition of the matter probably renders it unnecessary to consider the question of priorities. It is, however, found that the dates of assignment claimed by the Traders' Commercial Company are established.

If any further or more definite findings on this head are wanted, they may be applied for.

---

[1] The words "intent" and "intended" are used in that somewhat artificial sense, so often found in legal documents. That there was a conscious purpose to commit the offense of usury, that the lender wished to taint his contract with illegality, is certainly no more true than that many if not most lawbreakers willfully intend crime. A person sui juris intends to do that which he wittingly does. Here the truth was that discount company would not loan at 6 per cent. only. There had to be some other source of gain than that. Collections at 5 per cent were at once legal and profitable; and hence the form of contract. Fishel needed the money at almost any price—the exact form of price reckoning was immaterial to him—but what he could not endure was knowledge by his customers of what he was doing. Therefore the minds of parties met, on a scheme which appeared legal, and was legal if the printed agreement told the truth. As for Fishel, he had to pay, and cared not how he paid. It was not necessary that the word "usury" should have occurred to either party. If they intended what amounts to usury, then in legal effect they intended usury.