**MINTZ v. HORNBLOWER & WEEKS.**

No. 7165.

Circuit Court of Appeals, Sixth Circuit.

April 16, 1936.

Milton Schmidt, of Cincinnati, Ohio (William Henry Gallagher and McLeod, Fixel, Abbott & Fixel, all of Detroit, Mich., on the brief), for appellant.

Edward T. Kelley, of Detroit, Mich. (Monaghan, Crowley, Reilley & Kellogg, of Detroit, Mich., on the brief), for appellee.

Before HICKS, SIMONS, and ALLEN, Circuit Judges.

HICKS, Circuit Judge.

Suit by appellee, stockbrokers, against appellant, to recover $19,038.70, with interest, balance due upon guaranties alleged to have been made by him of the brokerage accounts of Beatrice Mintz Fink and S. Lemberg. Appellant denied liability and pleaded a set-off of (1) $37,695.66, being the amount of alleged usurious interest charges made by appellee against him; and (2) $9,410.79, a balance which had been used by it in reduction of the amounts claimed on the Fink and Lemberg guaranties.

At the close of the evidence each party moved for a directed verdict. The court

sustained appellee's motion and denied that of appellant.

In 1928 appellant transferred his brokerage account from the J. S. Bache Company to the Detroit office of appellee; the latter paying some $800,000 in exchange for his securities. At about the same time trading accounts were opened by appellant with appellee in the name of Beatrice Mintz (later Mrs. Beatrice Mintz Fink), a daughter of appellant, and in the name of S. Lemberg, his half sister.

The alleged guaranties upon which appellee brought suit are printed in the margin as Exhibits A and B.[1]

Under the rules of the stock exchange, a customer buying and selling through a broker was required to put up with the broker a margin of security, ranging at times from 20 to 33⅓ per cent. of the amount which he owed the broker. When the securities declined in value below the specified percentage of the amount he owed, the broker was then entitled to sell them to protect himself. Avoiding unnecessary detail, it is sufficient to say that all three accounts were for the most part undermargined from the 1st of January, 1930, until the securities in each were sold by appellee on May 27, 1930. When the proceeds of the sale were allocated, the Beatrice Mintz Fink account owed appellee $27,756.58; the S. Lemberg account owed $692.91; and appellant's individual account had a balance of $9,410.79. Giving appellant credit for his balance upon the Fink and the Lemberg indebtedness, there was due upon the guaranties, if valid, $19,038.-70, which with interest was the amount of the recovery against appellant.

█ It is urged that the Lemberg guaranty was without consideration, but there is substantial and uncontradicted evidence to the contrary. The Lemberg account being undermargined, on April 23, 1930, appellee called upon her for additional collateral, which she could not put up, and, for the purpose of obtaining more time for her, appellant requested appellee to accept his guaranty and carry the account for a while until it could be adjusted. Appellee did accept appellant's guaranty (Exhibit B), and in reliance thereon carried the account for 34 days, or until May 27, 1930, when it was closed out.

Forbearance is a consideration. Restatement of the Law of Contracts, § 75. In view of the fluctuating condition of the market, as indicated by the record, we cannot say as a matter of law that the extension was unreasonably short.

█ Appellant contends that the Fink guaranty (Exhibit A) was invalid because appellee was pledged thereby to transfer from the Fink account to appellant's account 2,000 shares of Reynolds Spring and 100 shares of Manhattan Electric Supply. The basis for the proposition is supposed to rest in the sentence, "In making this entry transfer the new balance together *with all securities long* to my account. * * *" (Italics ours.) It is conceded that securities were never transferred, but in our opinion this neglect did not nullify the "unconditioned" guaranty incorporated in the last sentence of the instrument. The two obligations are unrelated. The instrument is neither indefinite nor uncertain. The guaranty does not depend upon the transfer, which, if it had been made, would have amounted to no more than a bookkeeping entry. We are controlled by the instrument, and are unauthorized to write a nonexistent provision into it.

Appellant urges that the transfer was important. It was probably not very im-

---

1 "Exhibit 'A'
"May 1, 1929.
"Hornblower & Weeks, 244 Penobscot Bldg., Detroit, Michigan.
"Gentlemen: Please consider this your authority to change the name of the account of Beatrice Mintz to Beatrice Mintz Fink.
"Also, this is your authority to show that the new account is long 400 Motor Products at the original purchase price, and that $12,500.00 has been paid in. In making this entry transfer the new balance together with all securities long to my account, my intention being to show the Fink account long 400 Motor Products against the payment of $12,500.00.

"Please consider this my unconditional guarantee relative to any transactions covering the above mentioned account.
"Yours very truly,
"[Sgd.] Samuel Mintz."
"Exhibit 'B'
"Detroit, Michigan,
"April 23, 1930.
"Hornblower & Weeks, 244 Penobscot Bldg., Detroit, Michigan.
"Gentlemen: Relative to the account of S. Lemberg, please consider this my personal guarantee for said account; further, for collateral purposes said account may be figured with mine.
"Yours very truly,
"[Sgd.] Samuel Mintz."

portant to him, because there is substantial evidence that, as a matter of fact, appellant owned all three accounts. He was given statements of the Fink account monthly, and, of course, knew that the Reynolds Spring stocks and Manhattan Electric Supply stocks had not been transferred but remained in the Fink account until it was sold out. He never complained of the failure to make the transfer, but the consequences of the failure, whether of great or small moment, do not justify an unauthorized interpretation of the guaranty.

■ There was no error in the denial of appellant's motion for a verdict upon his claim of set-off or recoupment for usury. It is undisputed that one of the duties of appellee was to furnish the money with which to carry appellant's stocks. Richardson v. Shaw, 209 U.S. 365, 374, 28 S. Ct. 512, 52 L.Ed. 835, 14 Ann.Cas. 981. To meet his requirements in common with those of its customers generally, appellee had to borrow money from banks (usually in New York) either directly or through money brokers. Some of it was borrowed on time, running over a period of months, upon which it paid interest at regular rates. The remainder was "call" money; that is, money borrowed from day to day at rates of interest running as high as 15 per cent. to 30 per cent. during the strenuous trading days of 1929. Call money could be demanded by the banks the day after it was borrowed, and, if such was done, appellee had to pay it back at once and meet its money requirements by new borrowings.

These loans were like any other bank loans, in that they required security. This the brokers furnished by the deposit of its customers' stocks, bonds, etc., up to about 30 per cent. of the value of the loan. If a customer made a sale of stock thus put up as security, appellee had to send a clerk to the bank for that particular certificate and to substitute other security therefor. All this took time, and during days of active trading a clerk might have to wait in line for hours to effect the substitution.

All this activity cost money. The legal rate of interest was 6 per cent., but in days of heavy trading the demand of money was so high that often it could be obtained only at rates far above 6 per cent. This excess, as well as the legal rate, was necessarily charged proportionately to appellant and other customers, according to rule and custom of appellee and stockbrokers, generally, plus an additional fraction, usually one-eighth of 1 per cent., to cover the costs of the activities of the various clerks, officers, etc., in obtaining the loans. The excess over 6 per cent., plus the fraction, was lumped together and billed as a "Carrying Charge." No one understood this better than appellant, who had been an active trader both before and after he opened his account with appellee.

Appellant contends that these carrying charges were usurious. We think otherwise. They simply represent compensation for the use of appellee's credit and the trouble and expense incurred by it. See the recent case of United Light & Power Co. v. Grand Rapids Trust Co., Receiver, — F.(2d) —,[1] decided by this court February 10, 1936, and the cases there cited. See, also, Bibb v. Allen, 149 U.S. 481, 13 S.Ct. 950, 37 L.Ed. 819; In re Fishel Nessler & Co., 192 F. 412 (D.C.); Thurston v. Cornell, 38 N.Y. 281; Bennett v. Ginsberg, 141 App.Div. 66, 125 N.Y.S. 650.

Appellant contends that he was entitled to a directed verdict upon his claim for usury by virtue of section 379, chapter 21, art. 25, Cahill's Consol. Laws N.Y.1930 (Consol.Laws N.Y. c. 20).[2] We are not in agreement with appellant upon the point. True, he did not agree in writing to pay more than the legal interest, yet, as indicated above, the evidence does not indisputably show that appellee ever received or collected more than the legal rate as compensation for the use of its money. On the contrary, there was substantial evidence that the excess represented the carrying charge.

Judgment affirmed.

---

[1] Rehearing pending at date of publication.

[2] Interest permitted on advances on collateral security. In any case hereafter in which advances of money, repayable on demand, to an amount not less than five thousand dollars, are made upon warehouse receipts, bills of lading, certificates of stock, certificates of deposit, bills of exchange, bonds or other negotiable instruments pledged as collateral security for such repayment, it shall be lawful to receive or to contract to receive and collect, as compensation for making such advances, any sum to be agreed upon in writing, by the parties to such transaction.